173 S.W.3d 220 (2005)
In the Interest of M.F., a Child.
No. 05-04-01418-CV.
Court of Appeals of Texas, Dallas.
September 30, 2005.
*221 April E. Smith, Mesquite, for appellant.
William T. (Bill) Hill, Jr., Dallas, for appellee.
Before Justices MOSELY, BRIDGES, and O'NEILL.

OPINION
Opinion by Justice O'NEILL.
Mother appeals an order terminating her parental rights to her son, M.F. Mother contends the evidence is legally and factually insufficient to support the trial court's order. We conclude that the evidence is both legally and factually sufficient to terminate Mother's parental rights and affirm the trial court's order.

BACKGROUND
The Texas Department of Protective and Regulatory Services (The Department) filed a suit seeking termination of Mother's parental rights to M.F. The Department alleged that Mother (1) knowingly placed or allowed M.F. to remain in conditions or surroundings which endangered his physical or emotional well-being and (2) engaged in conduct or knowingly placed M.F. with persons who have engaged in conduct which endangered his physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (Vernon 2002). The Department also alleged that Mother has a mental or emotional illness or a mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of M.F. See TEX. FAM.CODE ANN. § 161.003 (Vernon 2002). Finally, the Department alleged that the termination of Mother's rights was in M.F.'s best interest. See TEX. FAM. CODE ANN. § 161.001(2) (Vernon 2002). Following a bench trial, the trial court found the allegations in the Department's petition to be true and entered an order terminating Mother's parental rights. In this appeal, Mother asserts the evidence is legally and factually insufficient to support the trial court's order.

TERMINATION OF PARENTAL RIGHTS
Before parental rights can be involuntarily terminated, the trial court must find that (1) the parent has committed one of the enumerated statutory conditions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). The burden of proof necessary to involuntarily terminate parental rights is proof by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Here, the trial court terminated Mother's parental rights under sections 161.001(1)(D), 161.001(1)(E), and 161.003 of the family code. The trial court was required to find only one of the statutory conditions to be true and that the termination was in M.F.'s best interest in order to terminate Mother's parental rights. TEX. FAM.CODE § 161.001 (Vernon 2002). Wilson v. State, 116 S.W.3d 923, 928 (Tex.App.-Dallas 2003, no pet.)
Under section 161.001(1)(D), the Department is required to prove by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon 2002). This section refers only to the acceptability of the child's living conditions. See In re *222 S.H.A., 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).
"Endanger" means to "expose to loss or injury; to jeopardize." In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Although "endanger" means more than a threat of physical injury or the possible ill effects of a less than ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. Id.

STANDARD OF REVIEW
In reviewing the legal sufficiency of the evidence, this court looks at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which the Department bears the burden of proof. In re J.F.C., 96 S.W.3d 256, 265-66 (Tex.2002); Wilson, 116 S.W.3d at 928. We assume that the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could so do, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. J.F.C., 96 S.W.3d at 266. We do not, however, disregard undisputed evidence that does not support the finding. Id.
When reviewing the factual sufficiency of the evidence to support a termination finding, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. Id. We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. Id. The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that a factfinder could not have reasonably formed a firm conviction or belief. Id.

FACTS
In October of 2003, Officer Jeff Smith was dispatched to an apartment complex where M.F. had fallen from a second-story balcony. When Smith arrived, he observed paramedics attending to M.F. who informed him that they were taking M.F. to the hospital because it appeared his leg was broken. Smith noticed toys laying around the area and also the remnants of M.F.'s soiled diaper. The diaper exploded when M.F. hit the ground, and pieces of it were scattered about the scene. Smith spoke with a witness at the apartment complex who told him she found M.F. after he had fallen from the balcony and that she alerted his mother about the incident. The witness directed Smith to Mother's apartment where Smith observed "one of the top five worst environments" he had ever seen in his eight years in law enforcement. The apartment was so cluttered he could not see the floor. There were trash bags everywhere and it smelled like a "dirty bathroom at a truck stop." The stench made him nauseous. In the bedroom, there was a bandana on the floor with clothes piled around it where Mother and M.F. slept. Smith almost fell three times on his way to examine the balcony door because of the clutter. When he got to the balcony door, he found that the latch was not working and that Mother had taped the door shut, but the tape was not sufficient to keep it shut. Smith found that the refrigerator and freezer were full of bags which held soiled diapers. The refrigerator also contained a bottle of PediaSure, milk, and a package of bologna. However, it was so full with soiled diapers that it was not cooling. Smith concluded his testimony by stating that he believed the conditions in the apartment were a *223 danger to M.F.'s physical and emotional well-being.
In 1991, Mother suffered a brain injury in a motor vehicle accident. Dr. Karen Grable, Mother's psychiatrist, testified that as a result, her short-term memory is impaired. Mother has also undergone a personality change that causes her to become obsessive and to exhibit poor judgment. She is delusional, psychotic, and is paranoid that there is a conspiracy to take her child away from her. Mother's sense of reality and judgment are also extremely impaired. Independent of the accident, Mother suffers from major depression and anxiety. Grable prescribed medication for Mother, but Mother has ceased taking her medications and stopped seeing Grable three months prior to trial. Grable's professional opinion is that Mother's conduct endangers the physical and emotional well-being of M.F. and that she is not capable of safely parenting him.
Jennifer Chappell, the CPS case worker assigned to M.F.'s case, testified that when M.F. was removed from Mother's care, she was allowed weekly visits. In the beginning, Mother would come to the visits with candy or a bottle of PediaSure and a bag of M.F.'s favorite toys. She always appeared excited to see M.F., but when she got into the visitation room, she would talk on her cell phone or just watch him play. She would not engage with M.F. On one occasion, he threw a frisbee at her in an attempt to play with her, but she just looked at it and did not throw it back to him. Chappell became concerned about Mother when she stopped seeing her psychiatrist. While she used to arrive early to her visits, she now began missing visits. When Mother did come to the visits, she appeared not to have bathed and was dazed. She even slept through several visits.
Since being placed in foster care, M.F. has thrived. Chappell testified that he "has totally come out of his shell." In the beginning, he would barely speak and showed little emotion. Now, however, things are exciting to him and he has grown physically. He enjoys school and interacts well with others. He no longer looks forward to visits with his mother and has expressed an interest in remaining with his foster family. Chappell indicated that M.F.'s foster parents want to adopt M.F. and are emotionally and financially able to support him. In Chappell's opinion, it is in M.F.'s best interest to be placed with his foster family permanently.
Dr. Beth Bontempo, a psychologist, testified that a Department case worker contacted her and requested that she observe one of the visits between Mother and M.F., which she did. Bontempo observed that M.F. was ambivalent in his feelings toward his mother and that Mother did nothing to engage M.F. During the visit, M.F. stated two or three times that he wanted to return to his foster family, but then also stated that he would miss his mother when their visit was over. Mother spent the majority of the visit simply sitting and watching M.F. At one point, she did show him some pictures she brought for him and hugged him back when he spontaneously hugged her. She also pushed a toy truck back and forth to him after he strongly insisted that she do so, but that was the extent of the interaction between the two. Bontempo also witnessed an instance when M.F. almost pulled a table down on top of himself and Mother did nothing to prevent it from happening. M.F. seemed frustrated and confused by his mother's refusal to interact with him during the visit. Bontempo concluded that Mother's extreme emotional detachment would endanger M.F.'s emotional well-being.
*224 Deanne Harris, a friend and former co-worker of Mother's, initially testified that she felt Mother's care for M.F. was appropriate and that he was not endangered by her care. However, later in her testimony, she admitted that the conditions in Mother's apartment were not appropriate and that someone suffering from psychosis should not be responsible for the care of a child.
Mother testified that at the time of M.F.'s fall from the balcony, she was working at Terrell State Hospital at night and caring for M.F. during the day. M.F. was previously enrolled in day care, but Mother allowed him to stop attending day care because he did not like it and because she feared someone there was sexually or physically abusing him. She agreed that her apartment was cluttered, but maintained she thought it was safe at the time because all of the poisons and knives were stored out of M.F.'s reach. When pushed by M.F.'s guardian ad litem to answer whether she felt her apartment was safe, Mother relented "probably not." She did not dispute the fact that the refrigerator and freezer were full of soiled diapers, but claimed that she stored them there because she could not take the trash out by herself because M.F. would run away from her while she did so. Prior to the trial in this case, Mother lived with Travis Woods, M.F.'s father, who has a criminal record and has been to prison. She admitted that she tried to become pregnant again by Woods while she lived with him. The day before trial, Mother moved in with Harris. She related that she is not working, but is looking for a job, and has stopped taking all of her prescribed medications. If given the opportunity, she would take M.F. to live at Harris's house and would not let her surroundings become so full of trash and clutter ever again.
M.F. was removed from Mother's care once before. When he was twenty-one months old, Mother was carrying M.F. down a flight of stairs when she fell on him, breaking his leg. The Department investigated the incident and M.F. was placed in foster care. M.F. was later returned to Mother, but was removed again when he fell from the balcony, resulting in the case at hand.

STATUTORY CONDITIONS
It is undisputed that Mother loves M.F. In fact, Grable and Chappell, both witnesses for the Department, testified to that effect. However, it is also undisputed that M.F.'s living conditions were unsafe and posed a danger to him. By Mother's own admission, the apartment in which she and M.F. lived was cluttered and full of trash. The broken latch on the balcony door and Mother's lack of supervision directly resulted in M.F. falling from the balcony, breaking his leg. Viewing the evidence in the light most favorable to the termination order, we conclude that the evidence is legally sufficient to support the order because a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly allowed M.F. to remain in conditions or surroundings which endangered his physical and emotional well-being by clear and convincing evidence. See J.F.C., 96 S.W.3d at 266. Likewise, after reviewing all of the evidence, we determine that the evidence is factually sufficient to support the termination order because a rational trier of fact could have reasonably formed a firm belief that Mother knowingly allowed M.F. to remain in conditions or surroundings which endangered his physical and emotional well-being by clear and convincing evidence. Id. Because the evidence is both legally and factually sufficient to support the trial court's order terminating Mother's rights pursuant to section *225 161.001(1)(D) of the family code, we need not address the other statutory grounds urged by the Department. Wilson, 116 S.W.3d at 928.

BEST INTEREST OF THE CHILD
In determining whether termination is in the child's best interest, the factfinder may consider the current and future physical and emotional needs of the child, the current and future physical and emotional danger the child may confront with his parent, and the parental abilities of the individual seeking custody. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). A finding that termination is in the child's best interest does not require proof of any certain set of factors, nor does it limit any specific factors. Wilson, 116 S.W.3d at 929. Evidence that proves one or more statutory grounds for termination may also be used to show that termination is in the child's best interest. In re C.H., 89 S.W.3d 17, 28 (Tex.2002).
In addition to the facts presented supporting the Department's allegations that M.F. should be removed from Mother's care because he was both physically and emotionally endangered, there was evidence that M.F.'s foster family wishes to adopt him and that he wishes to remain with them. M.F. is doing well in their care and they are emotionally, as well as financially, able to care for him. Therefore, viewing the light most favorable to the termination order, we conclude that the evidence is legally sufficient to support the trial court's order because a reasonable fact finder could have formed a firm belief or conviction that termination was in M.F.'s best interest by clear and convincing evidence. See J.F.C., 96 S.W.3d at 266. Further, viewing the entire record, the evidence is factually sufficient to support the termination order because a reasonable factfinder could have formed a firm belief or conviction that termination was in M.F.'s best interest by clear and convincing evidence. Id. Having determined that the evidence is legally and factually sufficient to support the trial court's order terminating Mother's parental rights, we affirm the trial court's order.