02-11-040-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00040-CV 

 

 


 
 
 In the Interest of Z.A.S., 
 a Child
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

 

          In
three issues, Appellant Mother challenges the sufficiency of the evidence to
support the trial court’s findings under subsections (D), (E), and (N) of Texas
Family Code section 161.001(1), which resulted in the termination of her
parental rights to Z.A.S.  We will affirm.

II.  Factual
and Procedural Background[2]

          Z.A.S.
was born December 11, 2009.  Mother said that Z.A.S.’s biological father was
M.C.  Because he is not a party to this appeal, the remainder of this
background section will focus on Mother’s actions and inactions related to
Z.A.S.

          A.      Mother
Leaves Z.A.S. with a Stranger

          Missy
Caddell testified that she knew Z.A.S. because he and Mother had stayed with
her mother, Peggy.  Missy first met Mother around the end of December 2009 or
the first of January 2010 at Peggy’s house.  Z.A.S. was approximately three
weeks old.  Missy understood that Mother was staying with Peggy because Mother
did not have anywhere else to stay.  

Missy
testified that she offered to watch three-week-old Z.A.S. so that Mother could
go to a party around January 1, 2010.  Mother took Missy up on her offer to
babysit even though Mother did not know Missy’s name or where she lived and did
not ask for that information.  Missy thought she was keeping Z.A.S. for the
night, but she ended up keeping him for three weeks.  During the three weeks
that Z.A.S. was with Missy, Mother was in and out of Peggy’s house, and each
time Missy went there, Mother was already gone.  Missy did not hear from Mother
for a few weeks.  After those three weeks, Missy took Z.A.S. to Peggy’s house,
and Mother kept the baby for a night or two before Missy came and took him back
with her.  Missy stocked up on formula and diapers and furnished those
necessities for Z.A.S.; Mother did not furnish any formula or diapers during
that time. 

In
February, after Z.A.S. had been with Mother at Peggy’s house for a few days,
Missy took Z.A.S. to the doctor and then to Cook Children’s Hospital because he
was “really sick, really congested, and kind of having a hard time breathing.”  Missy
typed a letter, which Mother signed, allowing Missy to seek treatment for
Z.A.S. at Cook Children’s.  While Z.A.S. was at the hospital, he was put on an
IV.  Upon discharge, he was given a prescription for a nasal spray, which Missy
had filled at a pharmacy.  Missy said that Z.A.S. was later diagnosed with thrush
while he was in her care. 

In
early March, Mother’s boyfriend Matt called Missy around 10 or 11 p.m. and
urged her to bring Z.A.S. to Mother and him.  Z.A.S. had already been bathed
and was in bed because he had been sick, so Missy said that she would bring him
the next day.  Matt texted threats to Missy regarding her and her children, so Missy
decided to meet him at Peggy’s.  Mother also texted Missy, but Mother acted
reasonably in her texts.  Missy and her husband gathered Z.A.S. and his
belongings and went to Peggy’s house to meet Mother. There was a small red car with
three people in it parked at Peggy’s house, and an older couple got out, took
Z.A.S., and drove away without taking Z.A.S.’s belongings.  Mother spoke to the
couple and said that she was going to meet up with them later that night, but
Mother said that she did not know them that well. Mother stayed at Peggy’s
house when the couple drove off with three-month-old Z.A.S.  Peggy told Mother
that if she was going to drive Z.A.S. around all hours of the night in the
cold, she could get her things and leave.  So Mother packed her things that
were at Peggy’s house and moved out.  

Although
Mother did not appear concerned, Missy said that she was concerned because the
couple was much older, Mother did not know them very well, their car did not
look very reliable, and they appeared strung out.  Missy and her husband called
the police and asked them to follow the couple that night. Missy testified that
she feared for Z.A.S. if he remained with Mother because of the people she
associated with. 

The
next time Missy saw Z.A.S. was when Mother called her to tell her that Z.A.S.
was two months behind on his vaccinations and asked her to take him to the
doctor.  Missy picked up Mother and Z.A.S. from a junkyard,[3]
and Mother went with Missy to take Z.A.S. to get his shots.  Missy saw Z.A.S.
one other time when she picked up Mother at the junkyard and took her to the
store to buy water. 

          B.      Z.A.S.’s
Removal

Jeremy
Dickinson, an investigator with CPS, testified that CPS received a referral on
March 5, 2010, alleging neglectful supervision because shortly after Mother
gave birth to Z.A.S., she had placed him with someone she had just met and had
not returned for two weeks.  A second referral came in after the March 5
referral, alleging that Mother had picked up Z.A.S. from the person she had
left him with and had asked for money for food and diapers because she could
not provide for him.[4]  With the second
referral, Dickinson received an address and was asked to investigate on March
12, 2010. 

Dickinson
went to the location of the address and found a trailer located on property that
appeared to be a junkyard.  Dickinson testified that it was “very difficult” to
navigate his way to the trailer because there was a “countless amount[] of
material from car parts to trash to everything.”  Dickinson spoke with Mother
inside the trailer, and she told him that the trailer had no electricity; he also
noted that there were tools, trash, and random items scattered throughout the
living room. Dickinson was not given permission to go past the living room, but
he did not recall seeing any bottles, formula, or diapers.  Mother stated that
she “was just staying there,” that she did not know who else was there, and
that was why she did not want him to walk through the rest of the home.[5]


          Mother
retrieved Z.A.S. from the bedroom and would not let Dickinson examine him.  Dickinson
saw that the bedroom was “extremely cluttered,” that it had a bed in it, and
that there was not much room for anything else.  It seemed to Dickinson that
Mother thought the conditions of the home were suitable, but Dickinson had
concerns about Z.A.S.’s physical safety based on the condition of the home.  

Dickinson
discussed the referrals with Mother, and she said that Z.A.S. had stayed with
friends and that he was on medication for thrush.  Mother told him that she had
only had Z.A.S. in her care for a few weeks.  Dickinson discussed CPS’s concern
that there was substance abuse, and Mother admitted taking two prescription
pills for which she did not have prescriptions;[6] Mother told him that she
had taken Vicodin one week prior to Dickinson’s visit and had taken Flexor, a
muscle relaxer, about two or three days prior to his visit.  Mother submitted
to a CPS oral swab test, which tested positive for methamphetamines and
amphetamines.  When Dickinson told Mother the results of the drug test, Mother
denied having used drugs. 

Dickinson
explained that—based on the condition of the home, the results of the drug
test, and Mother’s admission that she was taking prescription drugs for which
she did not have prescriptions—CPS needed to look into a safety placement for
Z.A.S.  When Dickinson asked Mother the name of a family member for a voluntary
placement, Mother did not give a name but instead picked up Z.A.S., went into
the bedroom, shut the door, and told Dickinson to leave.  Before exiting the
trailer, Dickinson told Mother that they needed to find a placement for Z.A.S.
and that he would have to discuss the case with his superiors. 

Dickinson
went outside and contacted his supervisor and the program director assigned the
case for Z.A.S.  They told Dickinson to take custody of Z.A.S., and Dickinson
contacted the Tarrant County Sheriff’s Department to alert them to the
situation.  Dickinson was outside on the phone for fifteen or twenty minutes,
and during that time, two people entered the trailer.  After the sheriff’s
department arrived, a man named Gene identified himself as the owner of the
property and gave Dickinson and the sheriff’s deputy permission to enter the
residence. 

Once
inside, Dickinson saw Mother crying as she cradled Z.A.S. and rocked back and
forth.  Mother told Dickinson not to take her baby.  After Dickinson told
Mother that they needed to take custody of Z.A.S. for his safety, Mother
relented and gave Z.A.S., along with his medications, to Dickinson. Dickinson explained
to Mother that a legal action had been filed, that CPS was involved, that
Dickinson was the investigator assigned to the case, that there would be a
court hearing the following day regarding CPS’s custody of Z.A.S., and that a
caseworker would give her a service plan and explain what was needed on
Mother’s part for her to have Z.A.S. returned to her.  Mother indicated that
she would be willing to participate in CPS services to have her child returned
to her.

After
Dickinson removed Z.A.S., he observed that Z.A.S. was dirty and that his diaper
was “completely soiled with urine.”  Mother did not ask to change Z.A.S.’s
soiled diaper before she gave him to Dickinson.  Z.A.S. was placed in a foster
home. 

Mother
appeared at the hearing on the day following the removal. Dickinson provided Mother
with the phone numbers for the Drug Court Program so that she could see if she
qualified for the program.  To Dickinson’s knowledge, Mother did not follow
through with the procedures to get into the Drug Court Program.  Mother
attended the visitations that Dickinson sat in on, and he did not have any
concerns about her interactions with Z.A.S. 

Dickinson
learned during his investigation that after Mother had left Z.A.S. with someone
she considered a friend, the friend had to take Z.A.S. to the hospital for
dehydration, and he had received an IV.  Mother had no explanation for why
Z.A.S. became dehydrated while he was in her care.  

At
the conclusion of Dickinson’s investigation, he disposed of the case as reason
to believe for neglectful supervision by Mother due to her positive drug test
and her admission to using prescription drugs without prescriptions. Dickinson
also made a finding of reason to believe for physical neglect by Mother due to
the state of the home as well as the condition of Z.A.S., who was dirty, had an
odor, and had a soiled diaper.  Dickinson made an additional finding of reason
to believe for medical neglect by Mother due to not properly addressing
Z.A.S.’s medical needs and not following through with medications.[7]


          C.      Mother’s
Caseworker

Vicki
L. Garza, the CPS caseworker assigned to Z.A.S.’s case, testified that she
first contacted Mother at the show cause hearing on April 1, 2010.  Garza told
Mother that she would receive a service plan and explained that her service
plan would encompass the services that she would be working in order to
mitigate the issues, mainly her drug use, which had caused Z.A.S. to come into
CPS’s care.  

1.       Mother’s Service Plan

Garza
told Mother that she was required to complete the service plan to show that she
could take care of her son.  Mother’s service plan required her to (1) remain
in contact with Garza on a weekly basis, (2) provide a safe and secure house,
(3) show that she could financially support Z.A.S., (4) attend weekly visits,
(5) submit to a psychological evaluation and follow all recommendations of the
therapist, (6) complete a drug and alcohol assessment, (7) submit to random
drug tests, and (8) attend parenting classes.  Garza went over the service plan
with Mother, and Mother indicated that she understood the plan and was willing
to comply.  Garza encouraged Mother to follow through and set up her services,
and Mother indicated that she would.  Mother brought her boyfriend Matt to a
meeting, and Garza asked him to participate in services; Matt refused and was
very hostile toward Garza. 

Mother
did not have any “follow-through” on any of her services during the months of
June and July, though she did make her weekly visits in July.  Mother said that
she did not have transportation, and Garza suggested that Mother take the bus.  When
Mother had no follow-through as of July, Garza told Mother that she was recommending
termination, and Mother told Garza that she was going to do everything she
could to get her son back.  On August 18, 2010, Garza met with Mother in
person, and Mother had still not followed through with any of the services that
Garza had set up.  Mother continued to excuse her lack of performance, stating
that she had no transportation.  Garza testified that she had left bus passes
at the CPS office, but Mother never picked them up. 

2.       Drug Court and Initial Drug Tests

Garza
talked to Mother about entering the Drug Court Program, and Mother indicated that
she wanted to participate.  Garza informed Mother that she needed to go to
Recovery Resource and get in touch with Vickie Keys so that Mother could
complete a drug assessment in order to find out if she was eligible for the Drug
Court Program.  Mother did not show for her appointment with Keys. 

When
Garza met with Mother on July 8, Mother’s hands were dirty, her eyes were red,
she smelled of marijuana, and she picked at her skin.  To Garza, it appeared
that Mother was high or had been high.  Mother told Garza that she had not used
drugs since Z.A.S.’s removal, but an oral swab revealed the presence of
methamphetamine, amphetamines, and marijuana.  Mother told Garza that the
positive test was due to her teeth; Mother’s teeth showed severe tooth decay,
and she believed methamphetamine was still in her teeth.  Mother never brought
in a note from a doctor saying that there was methamphetamine in her teeth that
would cause her to test positive for drugs. 

After
Mother’s visit with Z.A.S. on July 28, Garza talked to Mother about going to
recovery.  Mother said that she had no transportation.  Garza offered to take
Mother if she scheduled the appointment, but Mother never followed through.  Mother
tested positive for methamphetamine and amphetamines on July 28, and she
continued to deny using drugs.

Mother
told Garza that she had used illegal drugs in the past and that her drug of
choice was methamphetamine.  Mother never admitted to using methamphetamine or
other illegal drugs during the case, and Mother had only one drug test that was
negative.[8]  Garza had been told by
family members that Mother had an older son who did not live with Mother
because of her drug use. 

3.       Psychological Evaluation

Mother
did not attend the psychological evaluation on May 1, 2010.  Mother said that she
could not get in touch with Dr. Ryan to set up a psychological evaluation, so
around May 24, Garza called to set up an appointment for Mother and was told
that there were openings on May 31.  Garza left a message for Mother at her
stepmother’s and was told that Mother’s stepmother had not seen Mother for
several weeks.  Mother later called Garza and confirmed that she had received
the message and stated that she would undergo the psychological evaluation on
May 31.  Mother did not show for that appointment.  Mother ultimately followed
through with the psychological evaluation on January 6, 2011, which was four
days before the termination trial started. 

4.       Move to Georgia

During
Mother’s September 9, 2010 visit, she took a drug test[9]
and informed Garza that she was going to Georgia because she “needed to pull
herself away from the environment so she could try to get stuff done.”  Garza
told her “that it might be good for her because she couldn’t get clean here . .
. but that to work services it would be hard.”  Garza explained that if Mother
left Texas, Garza would not be able to help her with services and that it would
be Mother’s responsibility to work and pay for her services.  

After
Mother moved to Georgia, she called Garza on September 11 and gave her the
address where she was living at her mother’s, along with her mother’s phone
number.  Mother had talked to CPS in Georgia, and they had given Mother a list
of places that she could call to set up her own services. Mother had not set up
any services at that time. 

Garza
heard from Mother the next day on September 12 and encouraged her to be honest
with her mother about why Z.A.S. had been removed, and Garza talked to Mother
about her drug use.  

Garza
heard from Mother on September 17 when she called to tell Garza that she had
taken a drug test and that she was sending Garza the results. Garza told Mother
that the drug test would not qualify as a random drug test because no one from
CPS had requested it. 

Mother
later called and said that she had undergone a drug and alcohol assessment and
was sending the results, and Garza received the documents. After Garza reviewed
the documents, she had concerns about the drug and alcohol assessment because
Mother had told the provider that she had not used drugs in three years, which
was inconsistent with what Mother had told Garza. Garza had a conversation with
Mother about being honest with everybody because that was the only way that she
was going to get the help that she needed in order to be considered to have Z.A.S.
placed back with her. 

Mother
called Garza on November 9 and informed her that she would be back in Texas on
December 7, 2010, and that she would stay until January 8, 2011.  Garza
reminded Mother that the final hearing was scheduled for January 10, 2011.  Mother
said that she had set up a psychological evaluation for January 6, and Garza
said that was a concern because it was so close to the final hearing.  Garza
noted that during Mother’s phone calls from Georgia, she never asked Garza
about Z.A.S. 

5.       Back in Texas – Visits and Drug Tests

Mother
called Garza on December 7 and said that she was in Texas, and Garza scheduled a
visit.  During the December 10 visit, Z.A.S. was hesitant at first and cried
because he had not seen Mother in several months.  But once Mother began playing
with him, he settled down.  Garza talked to Mother after the visit, and Mother
said that she would not be returning to Georgia; she wanted to stay and work
her services.  Mother said that she had her psychological evaluation set up and
requested phone numbers for the other services; Garza gave the phone numbers to
her. 

Garza
requested that Mother submit to a hair follicle test on December 10, but she
did not go.  Garza followed up with Mother on December 13, and Mother said that
her initial transportation fell through and that the bus did not make it to the
drug testing facility before it closed.  Garza testified that Mother’s visit
with Z.A.S. ended at 10:00 a.m., that she visited with Garza until 11:00 a.m.,
that the drug testing facility was only fifteen minutes away, and that it
closed at 5:00 p.m. Garza requested that Mother go ahead and take the hair
follicle test on December 13.  On December 15, Garza followed up with Mother to
find out why she did not take the hair follicle test on December 13, and Mother
did not give Garza a reason. 

On
December 17, Mother arrived forty-five minutes late for her visit, so the visit
did not occur. 

During
the week of Christmas, Mother came to the CPS office and picked up bus passes. 

On December
20, Garza spoke with Mother on the phone and asked why she had been late for
the December 17 visit, and Mother told Garza that the friend she was riding
with had overslept.  Garza told Mother that the office would be closed on
December 24 and that the hour would be made up on December 31.  Mother did not
show for the December 31 visit. 

Mother
visited with Z.A.S. on January 7, 2011, and afterwards, Garza discussed her
concerns about Mother’s relationship with Matt and the condition of the home.  Mother
became angry and walked out. 

6.       Housing

Throughout
the case, Mother lived at various addresses.  At one point, Mother told Garza
that she lived in a trailer in Lake Worth but did not give Garza the address.  In
July 2010, Mother was separated from Matt and was living with a gentleman who
was giving her a place to live but who was threatening to kick her out. 

When
Mother returned from Georgia, she gave Garza the address where she was staying,
which belonged to her older son’s great uncle.  Garza made a home visit on
January 7, 2011, the Friday before the termination trial.  When she arrived,
Garza noted that there was “stuff” stored on a porch that had a door.  No one
answered when Garza knocked on the door.  Garza called the phone number that
Mother had given her and was told that Mother was in a building at the back of
the house; the person who answered the phone gave Garza permission to go to the
back of the house. 

In
the back yard, Garza observed several bags of trash, scattered toys, and two
buildings, one of which had a padlock on it.  Garza knocked on the door of one
of the buildings, Mother yelled out, Garza identified herself and said she
needed to talk to her, and Mother came to the door about five minutes later. Garza
described the home as more of a storage building with a screen door on it. When
Mother came to the door, the smell of stale cigarette smoke came out. Mother
was wearing a pair of pajama bottoms though it was around 10:30 or 11:00 a.m.
when Garza visited.  Garza noted that Mother’s fingernails were dirty, almost
black. 

At
first, Mother did not want Garza and her co-worker to come in because the house
was “a little messy.”  When Garza told Mother that she needed to see where
Z.A.S. would be living, Mother let her come in.  Garza said that there were no
lights on and that there was tape over the light switch; Garza did not check to
see if the electricity was working.  Garza did not remember seeing any windows
and said that it was dark.  She said that the room looked like it might have
been a craft room at one time, but there was trash all over the floor.  There
were several old tube televisions that had been taken apart, and a bed, which
Matt was in. When Garza asked if Mother was back together with Matt, she said
no and that he had only stayed the night.  Garza did not recall seeing any
place where there was running water. Mother said that she would be sleeping in
the storage shed but that she would have access to the main house.  Garza had
concerns about the living conditions in the home and did not feel like it was a
safe and stable home for Z.A.S. 

7.       Compliance

Garza
said that Mother had completed the drug assessment in Georgia and that, after
she returned to Texas, Mother had completed the psychological evaluation and
had set up parenting classes, which were supposed to start in January.  Of the
thirty-four visits available to Mother, she attended eighteen visits (missing
twelve visits during the time she was in Georgia and four visits while she was
in Texas), appeared under the influence at some visits, was late for two
visits, and tried to go to sleep during two visits.  Mother explained to Garza
that she was not able to make her visits because she did not have
transportation, but Garza noted that Mother was able to make it from Texas to
Georgia and back and that bus passes had been made available to, but not picked
up by, Mother until a few weeks before the termination trial. 

8.       Best Interest and Future Plans

Garza
testified that it was in Z.A.S.’s best interest for the trial court to
terminate Mother’s parental rights to him because Mother’s conduct was still
concerning, because she was still involved with people and still lived in an
environment that was endangering to Z.A.S., and because Mother had not lived in
the home for very long at the time of the termination trial.  Garza did not
believe that Mother had addressed her drug abuse issues, and Garza believed
that Mother’s drug-using lifestyle had been dangerous to Z.A.S. in the past and
would still be dangerous to him.  The Texas Department of Family and Protective
Services (the Department) asked to be named as permanent managing conservator
and stated that the plan for Z.A.S. was adoption by his foster family. 

          D.      Mother’s
Testimony

                   1.       Explanation
for Leaving Z.A.S. with a Stranger

Mother
testified that she had left Z.A.S. with Missy[10] for a week in January
but that Missy had brought Z.A.S. to Mother every day so that she could see him
while she was moving from Arlington to Fort Worth to stay with Missy’s mom
Peggy.  Mother admitted that it did not take her seven days to move her
belongings but that Z.A.S. was with Missy for seven days.  Mother said that
during those seven days, she did not use drugs.  After the seven days, Mother
got Z.A.S. back.  Missy wanted to watch Z.A.S. one night, so Mother took him to
her.  The next morning, Missy brought Z.A.S. back to Mother and said that he
had bronchitis, and Mother signed papers that Missy brought, allowing Missy to
seek treatment for Z.A.S. while Mother moved.[11]  Mother did not leave
Z.A.S. with Missy other than those two times.[12] 

2.       Z.A.S.’s Removal

Mother
testified that she never told Dickinson that she had taken prescription drugs
without a prescription.  Mother said that she had changed Z.A.S.’s diaper prior
to the time that he was removed and that Dickinson saw her change Z.A.S.’s
diaper.  Mother said that she had food and diapers for Z.A.S. at her house but
that Dickinson did not ask for those items when he removed Z.A.S.  Mother
testified that she gave Z.A.S. an oral antibiotic when he had thrush and that
she sent the medication with him when he was removed. 

3.       Service Plan Compliance

                             a.       Drug
Issues

Mother
said that initially she had set up her parenting and psychological evaluation,
but she was told to cancel those appointments because if she was accepted into
the Drug Court Program, it would interfere.  Mother wanted to get into the Drug
Court Program because she thought it would help her get Z.A.S. back.  She
believed that she had a drug problem when she was trying to get into the Drug
Court Program, but at the time of trial, she no longer believed that she had a
drug problem. 

Mother
went to Recovery Resource and met with Vickie Keys, who told Mother that she
was not a serious drug user and did not qualify for the Drug Court Program,
stopped Mother’s assessment, and sent Mother to talk to Holly McFarland.  Mother
said that she contacted McFarland at the Drug Court Program, and Mother was
told that she needed to complete a drug assessment.  Mother did not have
transportation and did not finish the drug assessment in Texas. 

When
Mother tested positive for drugs and was asked whether she was using drugs,
Mother said, “No.  I was using drugs prior to them taking [Z.A.S.], but not
during that, and I don’t -- I couldn’t go to the dentists to get -- I didn’t
have enough money to pay for that to get them to check me in and see if that
was the reason.”  When asked why Mother thought her teeth had anything to do
with her positive drug tests, Mother explained, “Because of how often I used
[methamphetamine] and how bad they are.  They call it meth-mouth.”  Mother
testified that “meth-mouth” meant that her teeth had decayed, that she was
susceptible to infections in her mouth, that the methamphetamine had eaten the
enamel off her teeth, and that she had lost teeth.  Mother said that she
started using methamphetamine at age twenty-one and that she had used methamphetamine
once or twice a month for a couple of months and had stopped. Mother started
using again at age twenty-seven and had used once a week for a couple of
months.  Mother started using again in February 2010 at age twenty-nine,
approximately one month before Z.A.S. was removed, and had used only once or
twice.  When Mother was asked if she expected the trial court to believe that approximately
twelve times of using methamphetamine would cause methamphetamine to remain in
her teeth and cause her to test positive for drugs, she said, “Well, that’s
what I think, but, you know, I don’t know.”

Mother
said that she never used methamphetamine while Z.A.S. was in the house.  When
Mother used methamphetamine in February 2010, Z.A.S. was at Missy’s, and Mother
was at Rolling Meadows.  However, Mother said that she did not leave Z.A.S.
with Missy so that she could use drugs. 

Mother
said that she was honest when she underwent the drug and alcohol assessment in
Georgia and that she did not say that she had not used drugs in three years.  Mother
said that as part of her drug and alcohol assessment, she was asked to take a
twenty-hour drug class, which she completed.  Mother forgot to give Garza the
paperwork showing that she had completed the class.  Initially, Mother could
not articulate what she learned in the twenty-hour drug class, but she answered
leading questions that she had learned that “it’s always great to tell the
truth” about everything, including her own drug use.  

Mother
admitted that she had not undergone any treatment between the time that she had
tried to get into the Drug Court Program and the trial; she did not think that
she needed any treatment.  Mother said that she had tried not to use drugs
before but that she had not counted the times that she had stopped using drugs;
she guessed that she had stopped using drugs on her own two or three times but had
always gone back to using. 

                   b.       Psychological
Evaluation

 Mother
said that she did not make her appointment with Dr. Parnell on May 1 for the
psychological evaluation because she did not know that her appointment was
scheduled for that date and that she missed the May 31 appointment because she
thought the office was closed for the holiday.  Mother said that the doctor
cancelled one of her appointments, though she could not recall the date,[13]
and she did not make another appointment for a while.  Mother eventually saw
Dr. Parnell on January 6, 2011. 

                   c.       Parenting
Classes

Mother
looked into taking parenting classes in Georgia, but they had finished for the
year and were not offering them again until January 11, 2011. Mother attempted
to set up parenting classes when she returned to Texas, but she was not able to
talk to the person in charge; the answering machine said that the person she
needed to speak with would not be in until January 20, 2011.  Mother said that
her main issue with not going to parenting classes was due to lack of
transportation, but she testified that she had better access to transportation
with her new residence. 

                   d.       Housing

When
Mother got pregnant with Z.A.S. in March 2009, she lived with an ex-boyfriend
in Sandy Beach RV Park in Fort Worth.  She moved in September 2009 to a
friend’s house.  After Z.A.S. was born in December 2009, Mother moved to
Peggy’s house. 

In
February 2010, Mother moved to Rolling Meadows.  Mother lived there until she
left for Georgia in September 2010. 

Mother
testified that she had been staying in the storage shed since December 6, 2010,
when she returned to Texas.  Mother said that she was staying with Cecil and
Amanda, who were the great uncle and cousin of Mother’s oldest child.[14] 

Mother
explained that there was junk in the yard at the place she was living because
it was a junkyard called Junkin’ Gene’s that collected scrap metal. Mother said
that the room she was staying in was cluttered because the prior owner had left
a lot of belongings, which were moved over to the side; the clutter was not so
bad that Z.A.S. would be endangered from it.  Mother said that there was
running water and electricity in the house.  Mother said that she slept in the
storage building but that she would be staying in the main house after a room
was remodeled.  Mother said that she tried to get Garza to go into the main
house but that Garza did not want to go in it.  Mother said that she did not
plan to raise Z.A.S. in the storage building but that the building was insulated
and had electricity. 

Mother
believed that she could provide Z.A.S. with a safe and stable home at Cecil and
Amanda’s house if Z.A.S. was returned to Mother.  Mother said that there would be
a room for Z.A.S. in the house when the remodeling was done. 

e.       Employment

During
the two years prior to trial, Mother had worked for only a couple of months as
a secretary for an auto repair and repossession service.  Mother said that she
had applied for jobs but that “getting a job hasn’t been easy.”[15]
 Mother said that she had previously been employed from 2005 to 2007. 

Mother
admitted that she was not employed at the time of the trial even though her
service plan required her to obtain employment.  Mother said that she was
providing for herself by scrapping metal, which involved tearing apart
equipment, and that is why there were parts in her home.  Mother did not make
any money in November; her mother provided for Mother while she was living in
Georgia.  In December, Mother made $200 by scrapping, and she testified that
she had already made $200 by scrapping during the first ten days in January. Mother
believed that she would be able to provide for Z.A.S. through scrapping or
another job and said that she had Cecil and Amanda’s support, but Mother did
not specify how much financial support they gave her. 

f.       Visits

Mother
explained her absences from the visits, stating that Z.A.S. did not come a
couple of times and that her visitations had been “switched around a lot,
different times, different days.”  Mother admitted that she had missed twelve
visits during the twelve weeks that she had spent in Georgia. 

                             g.       Overall
Compliance

Mother
testified that she had been trying to complete her parenting classes but had
not completed them at the time of the trial, that she had completed the drug
assessment in September 2010 in Georgia, that she had completed the twenty-hour
drug class in Georgia, and that she had completed the psychological evaluation
on January 6, 2011.  Mother testified that she had completed two of the three
tasks on her service plan; she did not complete parenting classes.  Also as
part of her service plan, Mother maintained contact with Garza, was protective
of Z.A.S. at the visitations, demonstrated the ability to bond with and nurture
Z.A.S., and had obtained housing. 

4.       Best Interest and Future

Mother’s
plans for Z.A.S. included giving him a stable environment, providing for him,
and taking care of him.  Mother believed that she could provide for Z.A.S. even
though she did not have health insurance for herself and was dependent on
someone for a home.  Mother said that she was willing to continue her services after
the trial and would complete the classes required by her service plan. 

Mother
felt that Z.A.S. had a bond with her and that she had a bond with him.  She
thought that it was in Z.A.S.’s best interest for him to live with her.  

E.      Foster
Mother’s Testimony

The
foster mother testified that Z.A.S. had been placed in her home around March
12, 2010.  At the time he arrived in the foster home, Z.A.S. was “very
underweight” and had thrush.  The foster mother testified that she took Z.A.S.
to the doctor, and Z.A.S. weighed eight pounds at three months old. 

At
the time of the trial, Z.A.S. was almost thirteen months old and weighed
twenty-one pounds.  He was walking, talking, and thriving.  Early Childhood
Intervention had evaluated him, and he did not need services.  The foster
mother testified that Z.A.S. was bonded with her family and that they wanted to
adopt him. 

          F.       Trial
Court’s Ruling

          After
hearing the above testimony, the trial court terminated Mother’s parental
rights to Z.A.S. after finding by clear and convincing evidence that Mother had
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings that endangered the physical or emotional well-being of the child;
had engaged in conduct or knowingly placed the child with persons who engaged
in conduct that endangered the physical or emotional well-being of the child; had
constructively abandoned the child who had been in the permanent or temporary
managing conservatorship of the Department or an authorized agency for not less
than six months and (1) the Department or authorized agency had made reasonable
efforts to return the child to Mother, (2) Mother had not regularly visited or
maintained significant contact with the child, and (3) Mother had demonstrated
an inability to provide the child with a safe environment; and that termination
of the parent-child relationship between Mother and Z.A.S. was in Z.A.S.’s best
interest.  Mother filed a motion for new trial, which was denied, and this
appeal followed. 

III. 
Legally and Factually
Sufficient Evidence
of Conduct and
Environmental Endangerment
to Support
Termination Order

 

In
her first and second issues, Mother argues that there is legally and factually
insufficient evidence to establish the termination grounds under family code
section 161.001(1)(D) and (E).  Mother focuses her argument on whether the
evidence showed that she had a history of instability, a limited work history,
housing problems, and a history of drug use. 

A.      Burden
of Proof and Standards of Review

          A
parent’s rights to “the companionship, care, custody, and management” of her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  See
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); Tex. Fam. Code Ann.
§ 161.206(b) (West 2008).  We strictly scrutinize termination proceedings
and strictly construe involuntary termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233
(Tex. App.—Fort Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2010); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001, 161.206(a).  Evidence is clear and convincing if it “will
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.”  Id. § 101.007
(West 2008).  Due process demands this heightened standard because termination
results in permanent, irrevocable changes for the parent and child.  In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243
S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not unreasonable. 
Id. at 573.

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that Mother violated section 161.001(1)(D) or (E) and that the termination of
the parent-child relationship would be in the best interest of the child.  Tex.
Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at 28.  If, in light of
the entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209
S.W.3d at 108. 

          B.      Law
on Endangerment

          Endangerment
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), the Department had to prove that Mother
knowingly placed or allowed Z.A.S. to remain in conditions or surroundings that
endangered his physical or emotional well-being.  See Tex. Fam. Code
Ann. § 161.001(1)(D); In re J.A.J., 225 S.W.3d 621, 625 (Tex.
App.—Houston [14th Dist.] 2006) (op. on reh’g), judgm’t aff’d in part, rev’d
in part, 243 S.W.3d 611 (Tex. 2007).  Subsection (D) focuses on the
suitability of the child’s living conditions.  J.A.J., 225 S.W.3d at
626.  Thus, under subsection (D), it must be the environment itself that causes
the child’s physical or emotional well-being to be endangered, not the parent’s
conduct.  Id. at 627.

          Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child’s physical well-being was the direct result of
Mother’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under subsection (E) must be based on more than a
single act or omission; the statute requires a voluntary, deliberate, and
conscious course of conduct by the parent.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. § 161.001(1)(E).  It is not necessary, however, that
the parent’s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The
specific danger to the child’s well-being may be inferred from parental
misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  Drug use and its
effect on a parent=s life and her ability to
parent may establish an endangering course of conduct.  Dupree v. Tex. Dep’t
of Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.—Dallas
1995, no writ).  As a general rule, conduct that subjects a child to a life of
uncertainty and instability endangers the child’s physical and emotional
well-being.  See In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio
1998, pet. denied).  To determine whether termination is necessary,
courts may look to parental conduct occurring both before and after the child’s
birth.  In re D.M., 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no
pet.). 

C.      Evidence
Is Legally and Factually Sufficient to Support Termination Order

 

          In
determining whether the evidence is legally and factually sufficient to support
termination of Mother’s parental rights pursuant to subsection (D) or (E), we
look at whether Mother (1) knowingly placed or knowingly allowed Z.A.S. to
remain in conditions or surroundings that endangered his physical or emotional
well-being or (2) engaged in conduct or knowingly placed Z.A.S. with persons
who engaged in conduct that endangered his physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E).  We will examine all of the evidence
in the record, focusing on the allegations of Mother’s drug use, instability,
limited employment, unsafe living conditions, and inability to care for Z.A.S.

The
record demonstrates that Mother used drugs and subjected Z.A.S. to others who appeared
to have used drugs.  On the day that Z.A.S. was removed, Mother told Dickinson
that she had taken Vicodin and Flexor; the testimony was unclear as to whether
Mother told Dickinson that she did not have prescriptions for those two drugs. 
Despite the testimony regarding Mother’s prescription drug use, the results
from an oral swab test clearly showed the presence of methamphetamine and
amphetamines in Mother’s system that day, despite that Mother denied using
drugs.  After Z.A.S. was removed, Mother tested positive on two occasions for methamphetamine
and amphetamines, and on one of those occasions, she also tested positive for
marijuana; during the case, she had only one negative drug test.  When Mother
returned from Georgia, she failed to show up for two drug tests, which counted
as if Mother had tested positive.  See In re W.E.C., 110 S.W.3d 231, 239
(Tex. App.—Fort Worth 2003, no pet.) (stating that a factfinder may reasonably
infer from a parent’s failure to attend scheduled drug screenings that the
parent was avoiding testing because the parent was using drugs).  Throughout
the case, Mother denied using drugs.  Mother firmly believed that she had
“meth-mouth,” despite only having used approximately twelve times, and said
that the alleged methamphetamine in her teeth had caused her to test positive for
methamphetamine.  While the record appears to show that Mother was given
confusing information about the particular order of the procedures necessary to
get into the Drug Court Program, Mother failed to show up for her appointments
and did not complete her drug evaluation until late in the case, leaving little
time for her to get treatment.  Although Mother did complete a twenty-hour drug
class, she did not attempt to get into a drug recovery program and did not
believe that she needed treatment, even though she admitted having quit using drugs
on numerous occasions only to later return to using.  Moreover, Mother allowed
an older couple, who appeared to be strung out on drugs, to take care of Z.A.S.
without her being present.  This is some evidence that Z.A.S.’s emotional or
physical well-being was endangered by Mother’s conduct.  See J.T.G., 121
S.W.3d at 125 (holding parents’ and caregiver’s illegal drug use supported a
finding that the child’s surroundings endangered her physical or emotional
well-being); D.M., 58 S.W.3d at 812–13 (holding evidence that mother had
a drug problem supported endangerment finding under subsection (E)); In re
T.D.L., No. 02-05-00250-CV, 2006 WL 302126, at *7–8 (Tex. App.—Fort Worth
Feb. 9, 2006, no pet.) (mem. op.) (holding that mother’s prior course of
conduct regarding her misuse of prescription drugs, her failure to take action
to correct her drug problem, and her multiple failures of drug tests supported
endangerment finding); In re B.S.W., No. 14-04-00496-CV, 2004 WL 2964015,
at *6–7 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.)
(holding that mother’s history of illegal drug use before and after child was
born, criminal activity, absence caused by imprisonment, and act of leaving
child with a person mother barely knew supported endangerment finding).

          The
record contains numerous examples of Mother’s instability and limited
employment.  As set forth above, Mother had worked only a couple of months as a
secretary during the two years prior to the trial and was supporting herself by
selling scrap metal at the time of the trial.  Mother, however, had made only
$400 at the time of trial by selling scrap metal.  As a result, Mother had
depended on others to provide diapers, formula, and housing and had moved frequently
throughout the time the case was pending as her relationships with her
benefactors ebbed and flowed.  Additionally, while the case was pending, Mother
moved to Georgia for twelve weeks, forfeiting twelve visits with her son.  At
the time of the trial, Mother had been back in Texas for only a month and thus
did not have a history of stable housing.  This is some evidence that Mother’s
conduct, including omissions, endangered Z.A.S.’s physical or emotional
well-being and that Mother exposed Z.A.S. to an unstable environment that
endangered Z.A.S.’s physical or emotional well-being.  See In re T.C.,
No. 10-10-00207-CV, 2010 WL 4983512, at *4–5 (Tex. App.—Waco Dec. 1, 2010, pet.
denied) (mem. op.) (holding that although there were recent developments that
showed improvements in mother’s stability, the trial court could reasonably
have determined that any evidence of improvement was short-lived and outweighed
by the extent of her prior history; thus, the evidence supported that mother,
by living in fifteen locations among other things, had engaged in conduct that
endangered child’s physical and emotional well-being); In re J.G.K., No.
02-10-00188-CV, 2011 WL 2518800, at *39 (Tex. App.—Fort Worth June 23, 2011, no
pet. h.) (mem. op.) (holding that mother’s having worked only two days in her
life, having moved constantly, and having depended on others for basic
necessities was some evidence that mother’s conduct, including omissions,
endangered her child’s physical or emotional well-being and that mother exposed
her child to an unstable environment that endangered the child’s physical or
emotional well-being).

Additionally,
the places that Mother chose for her family to live exhibited unsafe living
conditions for children.  When Z.A.S. was removed, he was living with Mother in
a trailer at a junkyard; the trailer did not have electricity, tools and trash were
scattered throughout the living room, and the bedroom was cluttered.  At the
time of the trial, Mother was living in a storage shed with no lights or running
water.  Trash and television parts littered the floor.  Although Mother said
that she had access to the main house on the property and that Z.A.S. would
have a room in the main house when the remodeling was complete, the record did
not contain evidence stating when the remodeling of the main house would be
completed.  This is some evidence that Mother’s conduct, including omissions,
created an environment that endangered Z.A.S.’s physical or emotional
well-being.  See In re K.M.B., 91 S.W.3d 18, 25 (Tex. App.—Fort Worth
2002, no pet.) (holding that unsanitary conditions of mother’s home, which
included roach and lice problems, animal feces, terrible odors, and general
filth, supported endangerment finding); see also In re M.F., 173 S.W.3d
220, 224 (Tex. App.—Dallas 2005, no pet.) (holding that child’s living
conditions were unsafe and posed a danger where mother admitted that apartment
was cluttered, full of trash, and had broken latch to balcony door).

          Moreover,
the record demonstrates that Z.A.S. was subjected to inappropriate caregivers. 
When Z.A.S. was three weeks old, Mother left him with a woman whose name and
address she did not know.  Missy, the stranger, thought she would watch Z.A.S.
overnight, but Mother left him with her for three weeks.  During the time that
Missy kept Z.A.S., he became ill, and Mother signed papers allowing Missy to
seek medical treatment for her son; Mother did not accompany them to the
hospital.  Although the record contains conflicting evidence on how often
Mother kept Z.A.S. from January 1, 2010, through March 5, 2010, the record is
clear that Z.A.S. suffered from bronchitis, dehydration, and thrush during this
time period and that Mother was not the person seeking medical treatment for
Z.A.S.  At one point, Z.A.S. was two months behind on his shots, and Mother
called Missy to take him to the doctor.  The record also disclosed that Z.A.S.
weighed only eight pounds at three months of age.  Additionally, as mentioned
in the discussion on drug use above, Mother allowed an older couple, whom
Mother did not know well, to take Z.A.S. late one evening even though they
appeared to be strung out on drugs.  The record also reveals that Mother,
herself, was not an appropriate caregiver because she neglected Z.A.S.; he was
dirty, had an odor, and had a soiled diaper at the time of his removal.  This
is some evidence that Mother’s conduct, as well as the conduct of those she
exposed Z.A.S. to, endangered Z.A.S.  See J.G.K., 2011 WL 2518800, at
*40 (holding that exposing children to inappropriate caregivers supported
endangerment finding); see also In re S.H.A., 728 S.W.2d 73, 87 (Tex.
App.—Dallas 1987, writ ref’d n.r.e.) (holding that evidence that parents did
not properly feed the child and did not seek appropriate medical treatment for
the child was some evidence to support jury’s findings that parents engaged in
conduct that endangered child’s physical or emotional well-being).

          Viewing
all the evidence in the light most favorable to the termination judgment and
disregarding all contrary evidence that a reasonable factfinder could
disregard, we hold that some evidence exists that will support a factfinder’s
firm conviction or belief that Mother violated subsections (D) and (E).  We
thus hold that the evidence is legally sufficient to support termination of
Mother’s parental rights to Z.A.S. under subsections (D) and (E).  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E); In re T.H., No.
02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no
pet.) (mem. op.) (holding evidence legally sufficient to support trial court’s
161.001(1)(D) and (E) findings because evidence showed that father had engaged
in conduct that subjected his children to a life of instability and
uncertainty, including living at more than five residences over five years,
living in residences that were “genuinely dirty” and in disarray, and using
illegal drugs); T.D.L., 2006 WL 302126, at *7–8 (holding evidence
legally sufficient to support trial court’s finding on endangerment because
evidence showed that mother had a history of misusing prescription drugs, took
little or no action to correct the problem, failed three drug tests, and blamed
her failure to comply with her service plan on lack of transportation).

Moreover,
viewing all of the evidence in a neutral light, the volume of evidence—set
forth extensively above—that a reasonable factfinder could have credited in
favor of subsections (D) and (E) findings is so significant that a factfinder
could reasonably have formed a firm conviction or belief of the truth of the
allegations that Mother had violated subsections (D) and (E).  See H.R.M.,
209 S.W.3d at 108; C.H., 89 S.W.3d at 28.  We therefore hold that the
evidence is factually sufficient to support termination of Mother’s parental
rights to Z.A.S. under subsections (D) and (E).  See Tex. Fam. Code Ann.
§ 161.001(1)(D), (E); T.H., 2008 WL 4831374, at *4–5 (holding evidence
factually sufficient to support trial court’s 161.001(1)(D) and (E) findings); T.D.L.,
2006 WL 302126, at *7–8 (holding evidence factually sufficient to support trial
court’s endangerment finding).  We overrule Mother’s first and second issues.

IV.  Conclusion

          Having
overruled all issues necessary to final disposition of this appeal,[16]
see Tex. R. App. P. 47.1, we affirm the trial court’s judgment
terminating Mother’s parental rights to Z.A.S.  

 

 

SUE WALKER

JUSTICE

 

PANEL: 
DAUPHINOT, GARDNER,
and WALKER, JJ.

 

DELIVERED:  August 25, 2011









[1]See Tex. R. App. P. 47.4.





[2]We recognize that some of
the testimony is conflicting and inconsistent.  This factual background section
of our opinion, however, sets forth the testimony given, even when it is
inconsistent.





[3]Missy never went inside the
residence at the junkyard. 





[4]Dickinson’s understanding
was that shortly after Z.A.S. was born, Mother had placed Z.A.S. with Ms.
Caddell’s mother Peggy, that Mother had come and picked him up, and that Mother
had later placed Z.A.S. with Missy. 





[5]Mother did not report having
another permanent address. 





[6]On cross-examination,
Dickinson was not sure whether Mother had said that she did not have prescriptions.






[7]Although Mother told
Dickinson that she gave Z.A.S. medication for his thrush, Dickinson concluded
that Mother was being medically neglectful by not resolving the thrush issue
because Z.A.S. still had thrush at the time of the removal. 





[8]According to the record,
Garza gave Mother only one drug test that was not the oral-swab type, and the
result of that test was negative for the presence of drugs.





[9]Garza was not allowed to
testify as to the results because the trial court sustained an objection by the
ad litem attorney representing the biological father.  This was the first
objection to the drug test results.  All previous results came in without
objection.





[10]“Missy” is the only name
that Mother knew the lady by.  Mother interpreted Garza’s references to “Ms.
Caddell” as “Missy” and said that Missy’s mother was Peggy.  When Mother was
asked how to spell Peggy’s last name, she said that she did not know what her
last name was. 





[11]Mother said that Z.A.S.
was with Missy “a day or two before the dehydration or whatever was brought up.”






[12]According to Missy, from
January 1 through March 5, Z.A.S. stayed with her all but four or five nights.  Missy
said that it was incorrect if Mother testified that she had left Z.A.S. with
Missy for a stretch of seven nights and one other night.  Missy said that it
was also incorrect if Mother testified that Missy brought Z.A.S. to Mother
every day.  Missy left Z.A.S. at Peggy’s house with Mother for four or five
days total during the January 1 to March 5 time period. 





[13]Garza testified that the
doctor did not cancel an appointment. 





[14]Mother testified that she
had an eleven-year-old son named D.S. who lived with his father in Fort Worth.  D.S.
last lived with Mother in 2005 or 2006. Mother said that she visited him as often
as possible but that she did not have a regular visitation schedule or a
custody agreement.  Mother said that she did not lose custody of D.S. because
of her drug abuse; his father “wanted him, so he has him.”  Mother said that
she wanted D.S. but did not have the means to take care of him.  Mother said
that she had not kept D.S. with her because she had “been taking care of the
other stuff” she needed to do before she got him. 





[15]Mother testified that her
drug use had not affected her ability to obtain stable housing or employment. 





[16]Texas law provides that
parental rights may properly be terminated when a trial court has made a
finding under either section 161.001(1) or section 161.003, plus a best
interest finding under section 161.001(2).  See W.E.C., 110 S.W.3d at
240.  Because we have held that termination was proper under section
161.001(1)(D) and (E), we need not address Mother=s
third issue in which she challenges the trial court=s termination of her parental rights based on
a ground listed under section 161.001(1)(N).