

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00040-CV

IN THE INTEREST OF Z.A.S.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

In three issues, Appellant Mother challenges the sufficiency of the evidence to support the trial court's findings under subsections (D), (E), and (N) of Texas Family Code section 161.001(1), which resulted in the termination of her parental rights to Z.A.S. We will affirm.

---

[1]See Tex. R. App. P. 47.4.

## II. Factual and Procedural Background[2]

Z.A.S. was born December 11, 2009.  Mother said that Z.A.S.'s biological father was M.C.  Because he is not a party to this appeal, the remainder of this background section will focus on Mother's actions and inactions related to Z.A.S.

### A.     Mother Leaves Z.A.S. with a Stranger

Missy Caddell testified that she knew Z.A.S. because he and Mother had stayed with her mother, Peggy.  Missy first met Mother around the end of December 2009 or the first of January 2010 at Peggy's house.  Z.A.S. was approximately three weeks old.  Missy understood that Mother was staying with Peggy because Mother did not have anywhere else to stay.

Missy testified that she offered to watch three-week-old Z.A.S. so that Mother could go to a party around January 1, 2010.  Mother took Missy up on her offer to babysit even though Mother did not know Missy's name or where she lived and did not ask for that information.  Missy thought she was keeping Z.A.S. for the night, but she ended up keeping him for three weeks.  During the three weeks that Z.A.S. was with Missy, Mother was in and out of Peggy's house, and each time Missy went there, Mother was already gone.  Missy did not hear from Mother for a few weeks.  After those three weeks, Missy took Z.A.S. to Peggy's house, and Mother kept the baby for a night or two before Missy came and took

---

[2]We recognize that some of the testimony is conflicting and inconsistent. This factual background section of our opinion, however, sets forth the testimony given, even when it is inconsistent.

him back with her. Missy stocked up on formula and diapers and furnished those necessities for Z.A.S.; Mother did not furnish any formula or diapers during that time.

In February, after Z.A.S. had been with Mother at Peggy's house for a few days, Missy took Z.A.S. to the doctor and then to Cook Children's Hospital because he was "really sick, really congested, and kind of having a hard time breathing." Missy typed a letter, which Mother signed, allowing Missy to seek treatment for Z.A.S. at Cook Children's. While Z.A.S. was at the hospital, he was put on an IV. Upon discharge, he was given a prescription for a nasal spray, which Missy had filled at a pharmacy. Missy said that Z.A.S. was later diagnosed with thrush while he was in her care.

In early March, Mother's boyfriend Matt called Missy around 10 or 11 p.m. and urged her to bring Z.A.S. to Mother and him. Z.A.S. had already been bathed and was in bed because he had been sick, so Missy said that she would bring him the next day. Matt texted threats to Missy regarding her and her children, so Missy decided to meet him at Peggy's. Mother also texted Missy, but Mother acted reasonably in her texts. Missy and her husband gathered Z.A.S. and his belongings and went to Peggy's house to meet Mother. There was a small red car with three people in it parked at Peggy's house, and an older couple got out, took Z.A.S., and drove away without taking Z.A.S.'s belongings. Mother spoke to the couple and said that she was going to meet up with them later that night, but Mother said that she did not know them that well. Mother

3

stayed at Peggy's house when the couple drove off with three-month-old Z.A.S. Peggy told Mother that if she was going to drive Z.A.S. around all hours of the night in the cold, she could get her things and leave. So Mother packed her things that were at Peggy's house and moved out.

Although Mother did not appear concerned, Missy said that she was concerned because the couple was much older, Mother did not know them very well, their car did not look very reliable, and they appeared strung out. Missy and her husband called the police and asked them to follow the couple that night. Missy testified that she feared for Z.A.S. if he remained with Mother because of the people she associated with.

The next time Missy saw Z.A.S. was when Mother called her to tell her that Z.A.S. was two months behind on his vaccinations and asked her to take him to the doctor. Missy picked up Mother and Z.A.S. from a junkyard,[3] and Mother went with Missy to take Z.A.S. to get his shots. Missy saw Z.A.S. one other time when she picked up Mother at the junkyard and took her to the store to buy water.

## B.    Z.A.S.'s Removal

Jeremy Dickinson, an investigator with CPS, testified that CPS received a referral on March 5, 2010, alleging neglectful supervision because shortly after Mother gave birth to Z.A.S., she had placed him with someone she had just met

---

[3]Missy never went inside the residence at the junkyard.

4

and had not returned for two weeks. A second referral came in after the March 5 referral, alleging that Mother had picked up Z.A.S. from the person she had left him with and had asked for money for food and diapers because she could not provide for him.[4] With the second referral, Dickinson received an address and was asked to investigate on March 12, 2010.

Dickinson went to the location of the address and found a trailer located on property that appeared to be a junkyard. Dickinson testified that it was "very difficult" to navigate his way to the trailer because there was a "countless amount[] of material from car parts to trash to everything." Dickinson spoke with Mother inside the trailer, and she told him that the trailer had no electricity; he also noted that there were tools, trash, and random items scattered throughout the living room. Dickinson was not given permission to go past the living room, but he did not recall seeing any bottles, formula, or diapers. Mother stated that she "was just staying there," that she did not know who else was there, and that was why she did not want him to walk through the rest of the home.[5]

Mother retrieved Z.A.S. from the bedroom and would not let Dickinson examine him. Dickinson saw that the bedroom was "extremely cluttered," that it had a bed in it, and that there was not much room for anything else. It seemed to

---

[4]Dickinson's understanding was that shortly after Z.A.S. was born, Mother had placed Z.A.S. with Ms. Caddell's mother Peggy, that Mother had come and picked him up, and that Mother had later placed Z.A.S. with Missy.

[5]Mother did not report having another permanent address.

5

Dickinson that Mother thought the conditions of the home were suitable, but Dickinson had concerns about Z.A.S.'s physical safety based on the condition of the home.

Dickinson discussed the referrals with Mother, and she said that Z.A.S. had stayed with friends and that he was on medication for thrush. Mother told him that she had only had Z.A.S. in her care for a few weeks. Dickinson discussed CPS's concern that there was substance abuse, and Mother admitted taking two prescription pills for which she did not have prescriptions;[6] Mother told him that she had taken Vicodin one week prior to Dickinson's visit and had taken Flexor, a muscle relaxer, about two or three days prior to his visit. Mother submitted to a CPS oral swab test, which tested positive for methamphetamines and amphetamines. When Dickinson told Mother the results of the drug test, Mother denied having used drugs.

Dickinson explained that—based on the condition of the home, the results of the drug test, and Mother's admission that she was taking prescription drugs for which she did not have prescriptions—CPS needed to look into a safety placement for Z.A.S. When Dickinson asked Mother the name of a family member for a voluntary placement, Mother did not give a name but instead picked up Z.A.S., went into the bedroom, shut the door, and told Dickinson to leave. Before exiting the trailer, Dickinson told Mother that they needed to find a

---

[6]On cross-examination, Dickinson was not sure whether Mother had said that she did not have prescriptions.

6

placement for Z.A.S. and that he would have to discuss the case with his superiors.

Dickinson went outside and contacted his supervisor and the program director assigned the case for Z.A.S. They told Dickinson to take custody of Z.A.S., and Dickinson contacted the Tarrant County Sheriff's Department to alert them to the situation. Dickinson was outside on the phone for fifteen or twenty minutes, and during that time, two people entered the trailer. After the sheriff's department arrived, a man named Gene identified himself as the owner of the property and gave Dickinson and the sheriff's deputy permission to enter the residence.

Once inside, Dickinson saw Mother crying as she cradled Z.A.S. and rocked back and forth. Mother told Dickinson not to take her baby. After Dickinson told Mother that they needed to take custody of Z.A.S. for his safety, Mother relented and gave Z.A.S., along with his medications, to Dickinson. Dickinson explained to Mother that a legal action had been filed, that CPS was involved, that Dickinson was the investigator assigned to the case, that there would be a court hearing the following day regarding CPS's custody of Z.A.S., and that a caseworker would give her a service plan and explain what was needed on Mother's part for her to have Z.A.S. returned to her. Mother indicated that she would be willing to participate in CPS services to have her child returned to her.

7

After Dickinson removed Z.A.S., he observed that Z.A.S. was dirty and that his diaper was "completely soiled with urine." Mother did not ask to change Z.A.S.'s soiled diaper before she gave him to Dickinson. Z.A.S. was placed in a foster home.

Mother appeared at the hearing on the day following the removal. Dickinson provided Mother with the phone numbers for the Drug Court Program so that she could see if she qualified for the program. To Dickinson's knowledge, Mother did not follow through with the procedures to get into the Drug Court Program. Mother attended the visitations that Dickinson sat in on, and he did not have any concerns about her interactions with Z.A.S.

Dickinson learned during his investigation that after Mother had left Z.A.S. with someone she considered a friend, the friend had to take Z.A.S. to the hospital for dehydration, and he had received an IV. Mother had no explanation for why Z.A.S. became dehydrated while he was in her care.

At the conclusion of Dickinson's investigation, he disposed of the case as reason to believe for neglectful supervision by Mother due to her positive drug test and her admission to using prescription drugs without prescriptions. Dickinson also made a finding of reason to believe for physical neglect by Mother due to the state of the home as well as the condition of Z.A.S., who was dirty, had an odor, and had a soiled diaper. Dickinson made an additional finding of

reason to believe for medical neglect by Mother due to not properly addressing Z.A.S.'s medical needs and not following through with medications.[7]

## C.     Mother's Caseworker

Vicki L. Garza, the CPS caseworker assigned to Z.A.S.'s case, testified that she first contacted Mother at the show cause hearing on April 1, 2010. Garza told Mother that she would receive a service plan and explained that her service plan would encompass the services that she would be working in order to mitigate the issues, mainly her drug use, which had caused Z.A.S. to come into CPS's care.

### 1.     Mother's Service Plan

Garza told Mother that she was required to complete the service plan to show that she could take care of her son.  Mother's service plan required her to (1) remain in contact with Garza on a weekly basis, (2) provide a safe and secure house, (3) show that she could financially support Z.A.S., (4) attend weekly visits, (5) submit to a psychological evaluation and follow all recommendations of the therapist, (6) complete a drug and alcohol assessment, (7) submit to random drug tests, and (8) attend parenting classes.  Garza went over the service plan with Mother, and Mother indicated that she understood the plan and was willing to comply.  Garza encouraged Mother to follow through and set up her services,

---

[7]Although Mother told Dickinson that she gave Z.A.S. medication for his thrush, Dickinson concluded that Mother was being medically neglectful by not resolving the thrush issue because Z.A.S. still had thrush at the time of the removal.

and Mother indicated that she would. Mother brought her boyfriend Matt to a meeting, and Garza asked him to participate in services; Matt refused and was very hostile toward Garza.

Mother did not have any "follow-through" on any of her services during the months of June and July, though she did make her weekly visits in July. Mother said that she did not have transportation, and Garza suggested that Mother take the bus. When Mother had no follow-through as of July, Garza told Mother that she was recommending termination, and Mother told Garza that she was going to do everything she could to get her son back. On August 18, 2010, Garza met with Mother in person, and Mother had still not followed through with any of the services that Garza had set up. Mother continued to excuse her lack of performance, stating that she had no transportation. Garza testified that she had left bus passes at the CPS office, but Mother never picked them up.

### 2. Drug Court and Initial Drug Tests

Garza talked to Mother about entering the Drug Court Program, and Mother indicated that she wanted to participate. Garza informed Mother that she needed to go to Recovery Resource and get in touch with Vickie Keys so that Mother could complete a drug assessment in order to find out if she was eligible for the Drug Court Program. Mother did not show for her appointment with Keys.

When Garza met with Mother on July 8, Mother's hands were dirty, her eyes were red, she smelled of marijuana, and she picked at her skin. To Garza, it appeared that Mother was high or had been high. Mother told Garza that she

10

had not used drugs since Z.A.S.'s removal, but an oral swab revealed the presence of methamphetamine, amphetamines, and marijuana. Mother told Garza that the positive test was due to her teeth; Mother's teeth showed severe tooth decay, and she believed methamphetamine was still in her teeth. Mother never brought in a note from a doctor saying that there was methamphetamine in her teeth that would cause her to test positive for drugs.

After Mother's visit with Z.A.S. on July 28, Garza talked to Mother about going to recovery. Mother said that she had no transportation. Garza offered to take Mother if she scheduled the appointment, but Mother never followed through. Mother tested positive for methamphetamine and amphetamines on July 28, and she continued to deny using drugs.

Mother told Garza that she had used illegal drugs in the past and that her drug of choice was methamphetamine. Mother never admitted to using methamphetamine or other illegal drugs during the case, and Mother had only one drug test that was negative.[8] Garza had been told by family members that Mother had an older son who did not live with Mother because of her drug use.

### 3. Psychological Evaluation

Mother did not attend the psychological evaluation on May 1, 2010. Mother said that she could not get in touch with Dr. Ryan to set up a

---

[8]According to the record, Garza gave Mother only one drug test that was not the oral-swab type, and the result of that test was negative for the presence of drugs.

psychological evaluation, so around May 24, Garza called to set up an appointment for Mother and was told that there were openings on May 31. Garza left a message for Mother at her stepmother's and was told that Mother's stepmother had not seen Mother for several weeks. Mother later called Garza and confirmed that she had received the message and stated that she would undergo the psychological evaluation on May 31. Mother did not show for that appointment. Mother ultimately followed through with the psychological evaluation on January 6, 2011, which was four days before the termination trial started.

### 4. Move to Georgia

During Mother's September 9, 2010 visit, she took a drug test[9] and informed Garza that she was going to Georgia because she "needed to pull herself away from the environment so she could try to get stuff done." Garza told her "that it might be good for her because she couldn't get clean here . . . but that to work services it would be hard." Garza explained that if Mother left Texas, Garza would not be able to help her with services and that it would be Mother's responsibility to work and pay for her services.

After Mother moved to Georgia, she called Garza on September 11 and gave her the address where she was living at her mother's, along with her

---

[9]Garza was not allowed to testify as to the results because the trial court sustained an objection by the ad litem attorney representing the biological father. This was the first objection to the drug test results. All previous results came in without objection.

mother's phone number.  Mother had talked to CPS in Georgia, and they had given Mother a list of places that she could call to set up her own services. Mother had not set up any services at that time.

Garza heard from Mother the next day on September 12 and encouraged her to be honest with her mother about why Z.A.S. had been removed, and Garza talked to Mother about her drug use.

Garza heard from Mother on September 17 when she called to tell Garza that she had taken a drug test and that she was sending Garza the results. Garza told Mother that the drug test would not qualify as a random drug test because no one from CPS had requested it.

Mother later called and said that she had undergone a drug and alcohol assessment and was sending the results, and Garza received the documents. After Garza reviewed the documents, she had concerns about the drug and alcohol assessment because Mother had told the provider that she had not used drugs in three years, which was inconsistent with what Mother had told Garza. Garza had a conversation with Mother about being honest with everybody because that was the only way that she was going to get the help that she needed in order to be considered to have Z.A.S. placed back with her.

Mother called Garza on November 9 and informed her that she would be back in Texas on December 7, 2010, and that she would stay until January 8, 2011.  Garza reminded Mother that the final hearing was scheduled for January 10, 2011.  Mother said that she had set up a psychological evaluation for January

13

6, and Garza said that was a concern because it was so close to the final hearing. Garza noted that during Mother's phone calls from Georgia, she never asked Garza about Z.A.S.

## 5. Back in Texas – Visits and Drug Tests

Mother called Garza on December 7 and said that she was in Texas, and Garza scheduled a visit. During the December 10 visit, Z.A.S. was hesitant at first and cried because he had not seen Mother in several months. But once Mother began playing with him, he settled down. Garza talked to Mother after the visit, and Mother said that she would not be returning to Georgia; she wanted to stay and work her services. Mother said that she had her psychological evaluation set up and requested phone numbers for the other services; Garza gave the phone numbers to her.

Garza requested that Mother submit to a hair follicle test on December 10, but she did not go. Garza followed up with Mother on December 13, and Mother said that her initial transportation fell through and that the bus did not make it to the drug testing facility before it closed. Garza testified that Mother's visit with Z.A.S. ended at 10:00 a.m., that she visited with Garza until 11:00 a.m., that the drug testing facility was only fifteen minutes away, and that it closed at 5:00 p.m. Garza requested that Mother go ahead and take the hair follicle test on December 13. On December 15, Garza followed up with Mother to find out why she did not take the hair follicle test on December 13, and Mother did not give Garza a reason.

14

On December 17, Mother arrived forty-five minutes late for her visit, so the visit did not occur.

During the week of Christmas, Mother came to the CPS office and picked up bus passes.

On December 20, Garza spoke with Mother on the phone and asked why she had been late for the December 17 visit, and Mother told Garza that the friend she was riding with had overslept. Garza told Mother that the office would be closed on December 24 and that the hour would be made up on December 31. Mother did not show for the December 31 visit.

Mother visited with Z.A.S. on January 7, 2011, and afterwards, Garza discussed her concerns about Mother's relationship with Matt and the condition of the home. Mother became angry and walked out.

### 6. Housing

Throughout the case, Mother lived at various addresses. At one point, Mother told Garza that she lived in a trailer in Lake Worth but did not give Garza the address. In July 2010, Mother was separated from Matt and was living with a gentleman who was giving her a place to live but who was threatening to kick her out.

When Mother returned from Georgia, she gave Garza the address where she was staying, which belonged to her older son's great uncle. Garza made a home visit on January 7, 2011, the Friday before the termination trial. When she arrived, Garza noted that there was "stuff" stored on a porch that had a door. No

one answered when Garza knocked on the door. Garza called the phone number that Mother had given her and was told that Mother was in a building at the back of the house; the person who answered the phone gave Garza permission to go to the back of the house.

In the back yard, Garza observed several bags of trash, scattered toys, and two buildings, one of which had a padlock on it. Garza knocked on the door of one of the buildings, Mother yelled out, Garza identified herself and said she needed to talk to her, and Mother came to the door about five minutes later. Garza described the home as more of a storage building with a screen door on it. When Mother came to the door, the smell of stale cigarette smoke came out. Mother was wearing a pair of pajama bottoms though it was around 10:30 or 11:00 a.m. when Garza visited. Garza noted that Mother's fingernails were dirty, almost black.

At first, Mother did not want Garza and her co-worker to come in because the house was "a little messy." When Garza told Mother that she needed to see where Z.A.S. would be living, Mother let her come in. Garza said that there were no lights on and that there was tape over the light switch; Garza did not check to see if the electricity was working. Garza did not remember seeing any windows and said that it was dark. She said that the room looked like it might have been a craft room at one time, but there was trash all over the floor. There were several old tube televisions that had been taken apart, and a bed, which Matt was in. When Garza asked if Mother was back together with Matt, she said no and that

he had only stayed the night. Garza did not recall seeing any place where there was running water. Mother said that she would be sleeping in the storage shed but that she would have access to the main house. Garza had concerns about the living conditions in the home and did not feel like it was a safe and stable home for Z.A.S.

### 7. Compliance

Garza said that Mother had completed the drug assessment in Georgia and that, after she returned to Texas, Mother had completed the psychological evaluation and had set up parenting classes, which were supposed to start in January. Of the thirty-four visits available to Mother, she attended eighteen visits (missing twelve visits during the time she was in Georgia and four visits while she was in Texas), appeared under the influence at some visits, was late for two visits, and tried to go to sleep during two visits. Mother explained to Garza that she was not able to make her visits because she did not have transportation, but Garza noted that Mother was able to make it from Texas to Georgia and back and that bus passes had been made available to, but not picked up by, Mother until a few weeks before the termination trial.

### 8. Best Interest and Future Plans

Garza testified that it was in Z.A.S.'s best interest for the trial court to terminate Mother's parental rights to him because Mother's conduct was still concerning, because she was still involved with people and still lived in an environment that was endangering to Z.A.S., and because Mother had not lived

17

in the home for very long at the time of the termination trial. Garza did not believe that Mother had addressed her drug abuse issues, and Garza believed that Mother's drug-using lifestyle had been dangerous to Z.A.S. in the past and would still be dangerous to him. The Texas Department of Family and Protective Services (the Department) asked to be named as permanent managing conservator and stated that the plan for Z.A.S. was adoption by his foster family.

### D. Mother's Testimony

#### 1. Explanation for Leaving Z.A.S. with a Stranger

Mother testified that she had left Z.A.S. with Missy[10] for a week in January but that Missy had brought Z.A.S. to Mother every day so that she could see him while she was moving from Arlington to Fort Worth to stay with Missy's mom Peggy. Mother admitted that it did not take her seven days to move her belongings but that Z.A.S. was with Missy for seven days. Mother said that during those seven days, she did not use drugs. After the seven days, Mother got Z.A.S. back. Missy wanted to watch Z.A.S. one night, so Mother took him to her. The next morning, Missy brought Z.A.S. back to Mother and said that he had bronchitis, and Mother signed papers that Missy brought, allowing Missy to

---

[10]"Missy" is the only name that Mother knew the lady by. Mother interpreted Garza's references to "Ms. Caddell" as "Missy" and said that Missy's mother was Peggy. When Mother was asked how to spell Peggy's last name, she said that she did not know what her last name was.

seek treatment for Z.A.S. while Mother moved.[11]  Mother did not leave Z.A.S. with Missy other than those two times.[12]

### 2. Z.A.S.'s Removal

Mother testified that she never told Dickinson that she had taken prescription drugs without a prescription.  Mother said that she had changed Z.A.S.'s diaper prior to the time that he was removed and that Dickinson saw her change Z.A.S.'s diaper.  Mother said that she had food and diapers for Z.A.S. at her house but that Dickinson did not ask for those items when he removed Z.A.S.  Mother testified that she gave Z.A.S. an oral antibiotic when he had thrush and that she sent the medication with him when he was removed.

### 3. Service Plan Compliance

#### a. Drug Issues

Mother said that initially she had set up her parenting and psychological evaluation, but she was told to cancel those appointments because if she was accepted into the Drug Court Program, it would interfere.  Mother wanted to get into the Drug Court Program because she thought it would help her get Z.A.S.

---

[11]Mother said that Z.A.S. was with Missy "a day or two before the dehydration or whatever was brought up."

[12]According to Missy, from January 1 through March 5, Z.A.S. stayed with her all but four or five nights.  Missy said that it was incorrect if Mother testified that she had left Z.A.S. with Missy for a stretch of seven nights and one other night.  Missy said that it was also incorrect if Mother testified that Missy brought Z.A.S. to Mother every day.  Missy left Z.A.S. at Peggy's house with Mother for four or five days total during the January 1 to March 5 time period.

back.  She believed that she had a drug problem when she was trying to get into the Drug Court Program, but at the time of trial, she no longer believed that she had a drug problem.

Mother went to Recovery Resource and met with Vickie Keys, who told Mother that she was not a serious drug user and did not qualify for the Drug Court Program, stopped Mother's assessment, and sent Mother to talk to Holly McFarland.  Mother said that she contacted McFarland at the Drug Court Program, and Mother was told that she needed to complete a drug assessment.  Mother did not have transportation and did not finish the drug assessment in Texas.

When Mother tested positive for drugs and was asked whether she was using drugs, Mother said, "No.  I was using drugs prior to them taking [Z.A.S.], but not during that, and I don't -- I couldn't go to the dentists to get -- I didn't have enough money to pay for that to get them to check me in and see if that was the reason."  When asked why Mother thought her teeth had anything to do with her positive drug tests, Mother explained, "Because of how often I used [methamphetamine] and how bad they are.  They call it meth-mouth."  Mother testified that "meth-mouth" meant that her teeth had decayed, that she was susceptible to infections in her mouth, that the methamphetamine had eaten the enamel off her teeth, and that she had lost teeth.  Mother said that she started using methamphetamine at age twenty-one and that she had used methamphetamine once or twice a month for a couple of months and had

20

stopped. Mother started using again at age twenty-seven and had used once a week for a couple of months. Mother started using again in February 2010 at age twenty-nine, approximately one month before Z.A.S. was removed, and had used only once or twice. When Mother was asked if she expected the trial court to believe that approximately twelve times of using methamphetamine would cause methamphetamine to remain in her teeth and cause her to test positive for drugs, she said, "Well, that's what I think, but, you know, I don't know."

Mother said that she never used methamphetamine while Z.A.S. was in the house. When Mother used methamphetamine in February 2010, Z.A.S. was at Missy's, and Mother was at Rolling Meadows. However, Mother said that she did not leave Z.A.S. with Missy so that she could use drugs.

Mother said that she was honest when she underwent the drug and alcohol assessment in Georgia and that she did not say that she had not used drugs in three years. Mother said that as part of her drug and alcohol assessment, she was asked to take a twenty-hour drug class, which she completed. Mother forgot to give Garza the paperwork showing that she had completed the class. Initially, Mother could not articulate what she learned in the twenty-hour drug class, but she answered leading questions that she had learned that "it's always great to tell the truth" about everything, including her own drug use.

Mother admitted that she had not undergone any treatment between the time that she had tried to get into the Drug Court Program and the trial; she did

not think that she needed any treatment.  Mother said that she had tried not to use drugs before but that she had not counted the times that she had stopped using drugs; she guessed that she had stopped using drugs on her own two or three times but had always gone back to using.

### b.    Psychological Evaluation

Mother said that she did not make her appointment with Dr. Parnell on May 1 for the psychological evaluation because she did not know that her appointment was scheduled for that date and that she missed the May 31 appointment because she thought the office was closed for the holiday.  Mother said that the doctor cancelled one of her appointments, though she could not recall the date,[13] and she did not make another appointment for a while.  Mother eventually saw Dr. Parnell on January 6, 2011.

### c.    Parenting Classes

Mother looked into taking parenting classes in Georgia, but they had finished for the year and were not offering them again until January 11, 2011. Mother attempted to set up parenting classes when she returned to Texas, but she was not able to talk to the person in charge; the answering machine said that the person she needed to speak with would not be in until January 20, 2011. Mother said that her main issue with not going to parenting classes was due to

---

[13]Garza testified that the doctor did not cancel an appointment.

lack of transportation, but she testified that she had better access to transportation with her new residence.

### d. Housing

When Mother got pregnant with Z.A.S. in March 2009, she lived with an ex-boyfriend in Sandy Beach RV Park in Fort Worth. She moved in September 2009 to a friend's house. After Z.A.S. was born in December 2009, Mother moved to Peggy's house.

In February 2010, Mother moved to Rolling Meadows. Mother lived there until she left for Georgia in September 2010.

Mother testified that she had been staying in the storage shed since December 6, 2010, when she returned to Texas. Mother said that she was staying with Cecil and Amanda, who were the great uncle and cousin of Mother's oldest child.[14]

Mother explained that there was junk in the yard at the place she was living because it was a junkyard called Junkin' Gene's that collected scrap metal. Mother said that the room she was staying in was cluttered because the prior owner had left a lot of belongings, which were moved over to the side; the clutter

---

[14]Mother testified that she had an eleven-year-old son named D.S. who lived with his father in Fort Worth. D.S. last lived with Mother in 2005 or 2006. Mother said that she visited him as often as possible but that she did not have a regular visitation schedule or a custody agreement. Mother said that she did not lose custody of D.S. because of her drug abuse; his father "wanted him, so he has him." Mother said that she wanted D.S. but did not have the means to take care of him. Mother said that she had not kept D.S. with her because she had "been taking care of the other stuff" she needed to do before she got him.

was not so bad that Z.A.S. would be endangered from it. Mother said that there was running water and electricity in the house. Mother said that she slept in the storage building but that she would be staying in the main house after a room was remodeled. Mother said that she tried to get Garza to go into the main house but that Garza did not want to go in it. Mother said that she did not plan to raise Z.A.S. in the storage building but that the building was insulated and had electricity.

Mother believed that she could provide Z.A.S. with a safe and stable home at Cecil and Amanda's house if Z.A.S. was returned to Mother. Mother said that there would be a room for Z.A.S. in the house when the remodeling was done.

### e. Employment

During the two years prior to trial, Mother had worked for only a couple of months as a secretary for an auto repair and repossession service. Mother said that she had applied for jobs but that "getting a job hasn't been easy."[15] Mother said that she had previously been employed from 2005 to 2007.

Mother admitted that she was not employed at the time of the trial even though her service plan required her to obtain employment. Mother said that she was providing for herself by scrapping metal, which involved tearing apart equipment, and that is why there were parts in her home. Mother did not make any money in November; her mother provided for Mother while she was living in

---

[15]Mother testified that her drug use had not affected her ability to obtain stable housing or employment.

Georgia. In December, Mother made $200 by scrapping, and she testified that she had already made $200 by scrapping during the first ten days in January. Mother believed that she would be able to provide for Z.A.S. through scrapping or another job and said that she had Cecil and Amanda's support, but Mother did not specify how much financial support they gave her.

### f. Visits

Mother explained her absences from the visits, stating that Z.A.S. did not come a couple of times and that her visitations had been "switched around a lot, different times, different days." Mother admitted that she had missed twelve visits during the twelve weeks that she had spent in Georgia.

### g. Overall Compliance

Mother testified that she had been trying to complete her parenting classes but had not completed them at the time of the trial, that she had completed the drug assessment in September 2010 in Georgia, that she had completed the twenty-hour drug class in Georgia, and that she had completed the psychological evaluation on January 6, 2011. Mother testified that she had completed two of the three tasks on her service plan; she did not complete parenting classes. Also as part of her service plan, Mother maintained contact with Garza, was protective of Z.A.S. at the visitations, demonstrated the ability to bond with and nurture Z.A.S., and had obtained housing.

### 4. Best Interest and Future

Mother's plans for Z.A.S. included giving him a stable environment, providing for him, and taking care of him. Mother believed that she could provide for Z.A.S. even though she did not have health insurance for herself and was dependent on someone for a home. Mother said that she was willing to continue her services after the trial and would complete the classes required by her service plan.

Mother felt that Z.A.S. had a bond with her and that she had a bond with him. She thought that it was in Z.A.S.'s best interest for him to live with her.

### E. Foster Mother's Testimony

The foster mother testified that Z.A.S. had been placed in her home around March 12, 2010. At the time he arrived in the foster home, Z.A.S. was "very underweight" and had thrush. The foster mother testified that she took Z.A.S. to the doctor, and Z.A.S. weighed eight pounds at three months old.

At the time of the trial, Z.A.S. was almost thirteen months old and weighed twenty-one pounds. He was walking, talking, and thriving. Early Childhood Intervention had evaluated him, and he did not need services. The foster mother testified that Z.A.S. was bonded with her family and that they wanted to adopt him.

### F. Trial Court's Ruling

After hearing the above testimony, the trial court terminated Mother's parental rights to Z.A.S. after finding by clear and convincing evidence that

26

Mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child; had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child; had constructively abandoned the child who had been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and (1) the Department or authorized agency had made reasonable efforts to return the child to Mother, (2) Mother had not regularly visited or maintained significant contact with the child, and (3) Mother had demonstrated an inability to provide the child with a safe environment; and that termination of the parent-child relationship between Mother and Z.A.S. was in Z.A.S.'s best interest. Mother filed a motion for new trial, which was denied, and this appeal followed.

### III. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE OF CONDUCT AND ENVIRONMENTAL ENDANGERMENT TO SUPPORT TERMINATION ORDER

In her first and second issues, Mother argues that there is legally and factually insufficient evidence to establish the termination grounds under family code section 161.001(1)(D) and (E). Mother focuses her argument on whether the evidence showed that she had a history of instability, a limited work history, housing problems, and a history of drug use.

## A.      Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); Tex. Fam. Code Ann. § 161.206(b) (West 2008). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be

28

established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated section 161.001(1)(D) or (E) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B.    Law on Endangerment**

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove

endangerment under subsection (D), the Department had to prove that Mother knowingly placed or allowed Z.A.S. to remain in conditions or surroundings that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part*, 243 S.W.3d 611 (Tex. 2007). Subsection (D) focuses on the suitability of the child's living conditions. *J.A.J.*, 225 S.W.3d at 626. Thus, under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. *Id.* at 627.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Drug use and its effect on a parent's life and her ability to parent may establish

31

an endangering course of conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### C. Evidence Is Legally and Factually Sufficient to Support Termination Order

In determining whether the evidence is legally and factually sufficient to support termination of Mother's parental rights pursuant to subsection (D) or (E), we look at whether Mother (1) knowingly placed or knowingly allowed Z.A.S. to remain in conditions or surroundings that endangered his physical or emotional well-being or (2) engaged in conduct or knowingly placed Z.A.S. with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We will examine all of the evidence in the record, focusing on the allegations of Mother's drug use, instability, limited employment, unsafe living conditions, and inability to care for Z.A.S.

The record demonstrates that Mother used drugs and subjected Z.A.S. to others who appeared to have used drugs. On the day that Z.A.S. was removed,

32

Mother told Dickinson that she had taken Vicodin and Flexor; the testimony was unclear as to whether Mother told Dickinson that she did not have prescriptions for those two drugs. Despite the testimony regarding Mother's prescription drug use, the results from an oral swab test clearly showed the presence of methamphetamine and amphetamines in Mother's system that day, despite that Mother denied using drugs. After Z.A.S. was removed, Mother tested positive on two occasions for methamphetamine and amphetamines, and on one of those occasions, she also tested positive for marijuana; during the case, she had only one negative drug test. When Mother returned from Georgia, she failed to show up for two drug tests, which counted as if Mother had tested positive. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (stating that a factfinder may reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs). Throughout the case, Mother denied using drugs. Mother firmly believed that she had "meth-mouth," despite only having used approximately twelve times, and said that the alleged methamphetamine in her teeth had caused her to test positive for methamphetamine. While the record appears to show that Mother was given confusing information about the particular order of the procedures necessary to get into the Drug Court Program, Mother failed to show up for her appointments and did not complete her drug evaluation until late in the case, leaving little time for her to get treatment. Although Mother did complete a twenty-hour drug class, she did not attempt to get into a drug recovery program

and did not believe that she needed treatment, even though she admitted having quit using drugs on numerous occasions only to later return to using. Moreover, Mother allowed an older couple, who appeared to be strung out on drugs, to take care of Z.A.S. without her being present. This is some evidence that Z.A.S.'s emotional or physical well-being was endangered by Mother's conduct. *See J.T.G.*, 121 S.W.3d at 125 (holding parents' and caregiver's illegal drug use supported a finding that the child's surroundings endangered her physical or emotional well-being); *D.M.*, 58 S.W.3d at 812–13 (holding evidence that mother had a drug problem supported endangerment finding under subsection (E)); *In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *7–8 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (holding that mother's prior course of conduct regarding her misuse of prescription drugs, her failure to take action to correct her drug problem, and her multiple failures of drug tests supported endangerment finding); *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *6–7 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (holding that mother's history of illegal drug use before and after child was born, criminal activity, absence caused by imprisonment, and act of leaving child with a person mother barely knew supported endangerment finding).

The record contains numerous examples of Mother's instability and limited employment. As set forth above, Mother had worked only a couple of months as a secretary during the two years prior to the trial and was supporting herself by selling scrap metal at the time of the trial. Mother, however, had made only $400

at the time of trial by selling scrap metal. As a result, Mother had depended on others to provide diapers, formula, and housing and had moved frequently throughout the time the case was pending as her relationships with her benefactors ebbed and flowed. Additionally, while the case was pending, Mother moved to Georgia for twelve weeks, forfeiting twelve visits with her son. At the time of the trial, Mother had been back in Texas for only a month and thus did not have a history of stable housing. This is some evidence that Mother's conduct, including omissions, endangered Z.A.S.'s physical or emotional well-being and that Mother exposed Z.A.S. to an unstable environment that endangered Z.A.S.'s physical or emotional well-being. *See In re T.C.*, No. 10-10-00207-CV, 2010 WL 4983512, at *4–5 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (holding that although there were recent developments that showed improvements in mother's stability, the trial court could reasonably have determined that any evidence of improvement was short-lived and outweighed by the extent of her prior history; thus, the evidence supported that mother, by living in fifteen locations among other things, had engaged in conduct that endangered child's physical and emotional well-being); *In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *39 (Tex. App.—Fort Worth June 23, 2011, no pet. h.) (mem. op.) (holding that mother's having worked only two days in her life, having moved constantly, and having depended on others for basic necessities was some evidence that mother's conduct, including omissions, endangered her child's physical or emotional well-being and that mother exposed her child to an

unstable environment that endangered the child's physical or emotional well-being).

Additionally, the places that Mother chose for her family to live exhibited unsafe living conditions for children. When Z.A.S. was removed, he was living with Mother in a trailer at a junkyard; the trailer did not have electricity, tools and trash were scattered throughout the living room, and the bedroom was cluttered. At the time of the trial, Mother was living in a storage shed with no lights or running water. Trash and television parts littered the floor. Although Mother said that she had access to the main house on the property and that Z.A.S. would have a room in the main house when the remodeling was complete, the record did not contain evidence stating when the remodeling of the main house would be completed. This is some evidence that Mother's conduct, including omissions, created an environment that endangered Z.A.S.'s physical or emotional well-being. *See In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding that unsanitary conditions of mother's home, which included roach and lice problems, animal feces, terrible odors, and general filth, supported endangerment finding); *see also In re M.F.*, 173 S.W.3d 220, 224 (Tex. App.—Dallas 2005, no pet.) (holding that child's living conditions were unsafe and posed a danger where mother admitted that apartment was cluttered, full of trash, and had broken latch to balcony door).

Moreover, the record demonstrates that Z.A.S. was subjected to inappropriate caregivers. When Z.A.S. was three weeks old, Mother left him with

36

a woman whose name and address she did not know. Missy, the stranger, thought she would watch Z.A.S. overnight, but Mother left him with her for three weeks. During the time that Missy kept Z.A.S., he became ill, and Mother signed papers allowing Missy to seek medical treatment for her son; Mother did not accompany them to the hospital. Although the record contains conflicting evidence on how often Mother kept Z.A.S. from January 1, 2010, through March 5, 2010, the record is clear that Z.A.S. suffered from bronchitis, dehydration, and thrush during this time period and that Mother was not the person seeking medical treatment for Z.A.S. At one point, Z.A.S. was two months behind on his shots, and Mother called Missy to take him to the doctor. The record also disclosed that Z.A.S. weighed only eight pounds at three months of age. Additionally, as mentioned in the discussion on drug use above, Mother allowed an older couple, whom Mother did not know well, to take Z.A.S. late one evening even though they appeared to be strung out on drugs. The record also reveals that Mother, herself, was not an appropriate caregiver because she neglected Z.A.S.; he was dirty, had an odor, and had a soiled diaper at the time of his removal. This is some evidence that Mother's conduct, as well as the conduct of those she exposed Z.A.S. to, endangered Z.A.S. *See J.G.K.*, 2011 WL 2518800, at *40 (holding that exposing children to inappropriate caregivers supported endangerment finding); *see also In re S.H.A.*, 728 S.W.2d 73, 87 (Tex. App.— Dallas 1987, writ ref'd n.r.e.) (holding that evidence that parents did not properly feed the child and did not seek appropriate medical treatment for the child was

37

some evidence to support jury's findings that parents engaged in conduct that endangered child's physical or emotional well-being).

Viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that some evidence exists that will support a factfinder's firm conviction or belief that Mother violated subsections (D) and (E). We thus hold that the evidence is legally sufficient to support termination of Mother's parental rights to Z.A.S. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that father had engaged in conduct that subjected his children to a life of instability and uncertainty, including living at more than five residences over five years, living in residences that were "genuinely dirty" and in disarray, and using illegal drugs); *T.D.L.*, 2006 WL 302126, at *7–8 (holding evidence legally sufficient to support trial court's finding on endangerment because evidence showed that mother had a history of misusing prescription drugs, took little or no action to correct the problem, failed three drug tests, and blamed her failure to comply with her service plan on lack of transportation).

Moreover, viewing all of the evidence in a neutral light, the volume of evidence—set forth extensively above—that a reasonable factfinder could have credited in favor of subsections (D) and (E) findings is so significant that a

38

factfinder could reasonably have formed a firm conviction or belief of the truth of the allegations that Mother had violated subsections (D) and (E). *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. We therefore hold that the evidence is factually sufficient to support termination of Mother's parental rights to Z.A.S. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *T.H.*, 2008 WL 4831374, at *4–5 (holding evidence factually sufficient to support trial court's 161.001(1)(D) and (E) findings); *T.D.L.*, 2006 WL 302126, at *7–8 (holding evidence factually sufficient to support trial court's endangerment finding). We overrule Mother's first and second issues.

## IV. CONCLUSION

Having overruled all issues necessary to final disposition of this appeal,[16] *see* Tex. R. App. P. 47.1, we affirm the trial court's judgment terminating Mother's parental rights to Z.A.S.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: August 25, 2011

---

[16]Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2). *See W.E.C.*, 110 S.W.3d at 240. Because we have held that termination was proper under section 161.001(1)(D) and (E), we need not address Mother's third issue in which she challenges the trial court's termination of her parental rights based on a ground listed under section 161.001(1)(N).